**AFFIRMED as MODIFIED, and Opinion Filed April 17, 2024**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-01177-CR**

**No. 05-22-01178-CR**

**No. 05-22-01179-CR**

**RONDAL KEITH JACKSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause Nos. F18-25583-K, F18-25584-K, F18-25585-K**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Smith
Opinion by Justice Partida-Kipness

A jury convicted appellant Rondal Keith Jackson on three counts of aggravated sexual assault of a child, and the jury assessed punishment at thirty years' imprisonment for each count. The trial court entered judgment in accordance with the jury's verdicts. Jackson brings eleven issues on appeal, raising three primary arguments: (1) Jackson was entitled to acquittal after the trial court granted his motions for new trial, therefore his subsequent trial violated double-jeopardy principles (issues one through six); (2) the evidence is insufficient to support his

convictions (issues seven through nine); and (3) the judgments assess duplicative costs (issues ten and eleven). The State brings three-cross issues, asserting the judgments must be modified to reflect: (1) Jackson must register as a sex-offender; (2) his victim was ten years old; and (3) an affirmative finding the victim was younger than fourteen years old.

We conclude Jackson was not entitled to acquittal after the trial court granted his motions for new trial and thus his subsequent jury trial did not violate double-jeopardy principles. We further conclude the evidence was sufficient to support Jackson's convictions. We therefore overrule Jackson's issues one through nine. We agree that two of the judgments assess duplicative costs. We therefore sustain Jackson's issues ten and eleven, and we modify the judgments to delete the duplicative costs. We also sustain the State's three cross-issues and modify the judgments accordingly. We otherwise affirm the trial court's judgments.

## BACKGROUND[1]

### I.     Factual Background

Jackson and D.J., the complainant, are cousins. They are two of approximately twenty-two grandchildren of Brenda Bomar. Bomar raised and cared for many of those grandchildren at her house on Phoenix Drive in Garland, Texas. D.J., her brother (D.J.2), and her sister (B.J.) lived with Bomar full-time during much of their childhood. On many occasions, other grandchildren and family members would

---

[1]     We provide additional details in our analysis of Jackson's sufficiency challenges.

temporarily stay in the house. Around 2010 or 2011, Bomar's husband (Grandfather) developed lung cancer. He was hospitalized in January 2011. Bomar spent much of her time at Grandfather's bedside during the following months. In her absence, older grandchildren were left in charge at Bomar's house.

During 2011, Jackson would occasionally stay at Bomar's house, sometimes for weeks at a time. Jackson was nineteen or twenty years old during this time. Jackson sexually assaulted D.J. on several occasions during these stays at Bomar's house. D.J. was ten years old at the time. On the first occasion, Jackson requested D.J. massage his back. D.J. agreed, but during the massage Jackson pulled down his shorts and forced D.J.'s head down to his penis. He forced his penis in D.J.'s mouth and placed a finger in her vagina. Jackson threatened to kill her if she told anyone about the incident.

Sometime later, D.J. was left alone at Bomar's house with Jackson. D.J. locked herself in the bathroom out of fear, but Jackson opened the door with a wire hanger. Jackson again forced his penis into D.J.'s mouth and later ejaculated. He then pulled down D.J.'s pants and stuffed his penis into her anus.

Approximately ten assaults occurred over a period of time, with most incidents involving Jackson forcing D.J. to perform oral sex on him. On one occasion, Jackson attempted to insert his penis into D.J.'s vagina. Over time, D.J. became more compliant with Jackson's demands to avoid Jackson becoming aggressive.

Years later, in 2018, Jackson came back to stay at Bomar's house. D.J. was uncomfortable with Jackson's return. Jackson would sometimes enter the room when D.J. was attempting to change clothes or shower. D.J.'s sister B.J. witnessed one of these incidents. Sometime later, D.J. texted B.J. and told her Jackson had touched her when she was younger. B.J. persuaded D.J. to tell Bomar. D.J. then told Bomar that Jackson had raped her when she was ten years old. Bomar later spoke with Jackson in the garage of the Phoenix Drive house. Jackson initially denied any wrongdoing, but when Bomar specifically asked if he had done anything to D.J., Jackson dropped his head. Bomar recognized this as a tacit admission of guilt. Bomar later told Jackson he could no longer stay at the house. She drove him to the train station and gave him twenty dollars.

D.J. reported Jackson to the police. D.J. underwent a forensic interview at the Dallas Children's Advocacy Center (DCAC). The police arrested Jackson a few months later, and in early 2019 a grand jury indicted Jackson on three charges of aggravated sexual assault of a child.

## II.    Procedural History

Jackson's trial was set to begin on June 4, 2019. Prior to voir dire, Jackson signed an agreement in each case for a sentence recommendation of thirty years' imprisonment in exchange for a guilty plea. When the trial court asked if Jackson wanted to waive his right to a jury trial and plead guilty, Jackson initially equivocated. However, he ultimately decided to "take the [thirty] years," and waived

–4–

reading of the indictment. The State then offered Jackson's judicial confessions to support each plea. Jackson did not object. The trial court accepted the guilty plea and assessed three concurrent thirty-year sentences. Jackson later filed a boilerplate motion for new trial in each case, asserting each verdict "was contrary to the law and the evidence."

Sometime shortly after the plea hearing, someone noticed Jackson had not signed the judicial confessions offered in support of his plea. Jackson's attorney had signed the confessions for himself, but also wrote "refused to sign" on the line for Jackson's signature. On June 10th, 2019, the trial court held a hearing to address the unsigned judicial confessions. The trial judge explained to Jackson he could sign the judicial confessions in accordance with his prior plea deal, or the court would entertain a motion for new trial. Jackson indicated he wanted a new trial, and the trial court granted the motion.

Jackson's new trial began in October 2022. The State called D.J. and family members D.J.2, B.J., and Bomar in support of the prosecution. The State also submitted testimony from the investigating police officer and a forensic examiner and therapist from DCAC. The defense called several family members during its case-in-chief, including: Laniskha Edmond (Jackson's sister), Jacquala Edmond (Jackson's cousin), Zaniqua Davis (Jackson's aunt), and Lamisa Edmond (Jackson's cousin). The defense also offered testimony from the investigating officer. Finally, Jackson testified in his own defense.

The jury found Jackson guilty as charged in each of the three indictments. The jury assessed punishment at thirty years' imprisonment, and the trial court entered separate judgments in each cause in accordance with the jury's verdicts. Jackson appealed.

## STANDARDS OF REVIEW

### I. Double Jeopardy

Double jeopardy is a legal issue rooted in the Texas and federal constitutions. U.S. CONST. amend. V; TEX. CONST. art. I, § 14. Where a subsequent conviction has potentially violated double jeopardy and its resolution requires application of the law to facts not involving credibility and demeanor determinations, we review the issue de novo. *Sledge v. State*, 666 S.W.3d 592, 599 (Tex. Crim. App. 2023) (citations omitted).

### II. Sufficiency of the Evidence

In determining whether the evidence is sufficient to support a conviction, we must consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson v. Virginia*, 443

U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979)). When facts support conflicting inferences, the reviewing court must presume the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. *Id.* (citations omitted).

## III.    Modification of Judgments

This Court may modify the trial court's judgment to make the record speak the truth when it has the necessary data and information to do so. TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W. 2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

## ANALYSIS

Jackson raises eleven issues on appeal, grouped into three primary arguments. In issues one through six, Jackson argues the trial court erred by failing to render an acquittal after granting Jackson's motion for new trial and thereby subjecting Jackson to double jeopardy in his subsequent trial. In issues seven through nine, Jackson asserts the evidence is insufficient to support each of his convictions. In issues ten and eleven, Jackson asks the Court to delete duplicative costs in the judgments. In three cross-issues, the State asks us to modify the judgments to reflect Jackson must register as a sex offender and to include findings on the victim's age. We address these issues in turn.

## I.     Jackson Was Not Entitled To Acquittal

In issues one through six, Jackson argues the trial court erred when it failed to render an acquittal after granting his motion for new trial, subjecting him to double jeopardy in his subsequent trial. We disagree.

### A.     Double jeopardy

Under principles of double jeopardy, no person may be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Fifth Amendment offers three distinct protections: "protection against a second prosecution for the same offense after acquittal; protection against a second prosecution for the same offense after conviction; and protection against multiple punishments for the same offense." *Sledge*, 666 S.W.3d at 599. Our review in this case concerns the first category, whether Jackson's first prosecution and conviction—which culminated in the trial court's decision to grant a motion for new trial—constituted an acquittal such that Jackson's second prosecution for the same offenses violated the Fifth Amendment.[2]

---

[2]     Jackson did not litigate the double-jeopardy issue in the trial court but contends he may raise it for the first time on appeal. Because of the fundamental nature of the double-jeopardy protections, a double-jeopardy claim may be raised for the first time on appeal if: 1) the undisputed facts show the double-jeopardy violation is clearly apparent on the face of the record; and 2) enforcement of the usual rules of procedural default serves no legitimate state interest. *Ex parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013). A double-jeopardy claim is apparent on the face of the trial record if resolution of the claim does not require further proceedings for the purpose of introducing additional evidence in support of the double-jeopardy claim. *Id.* We conclude the record contains all the information needed to address the merits of the double-jeopardy claim, and we perceive no legitimate interest in maintaining a conviction if it is clear on the face of the record the conviction was obtained in contravention of double-jeopardy protections. *See id.* The State does not argue Jackson's double-jeopardy arguments are not properly before the Court. Accordingly, we address the double-jeopardy issues.

Our appellate rules of procedure compel that a defendant must be granted a new trial when "the verdict is contrary to the law and the evidence." TEX. R. APP. P. 21.3(h). Generally, double-jeopardy principles do not bar a new trial granted at the defendant's request. *See Lofton v. State*, 777 S.W.2d 96, 97 (Tex. Crim. App. 1989). However, when a motion for new trial is granted on the ground of constitutionally-insufficient evidence and the State allows that decision to become final, the defendant has been acquitted and cannot be retried for the same offense. *Sledge*, 666 S.W.3d at 601-02.

Guilty pleas differ in an important respect: there is no federal constitutional requirement that evidence of guilt must be offered to corroborate a guilty plea in a state criminal prosecution. *Ex parte Williams*, 703 S.W.2d 674, 682 (Tex. Crim. App. 1986). Instead, Texas law requires the State offer sufficient proof to support a judgment based on a guilty plea to a felony case tried before the court. TEX. CODE CRIM. PROC. art. 1.15; *Williams*, 703 S.W.2d at 678. Article 1.15 provides the defendant may consent to an oral or written stipulation of what the evidence against him would be, without necessarily admitting to its veracity or accuracy, and such stipulation of evidence will suffice to support the guilty plea so long as it embraces every constituent element of the charged offense. *Menefee v. State*, 287 S.W.3d 9, 13 (Tex. Crim. App. 2009) (citing TEX. CODE CRIM. PROC. art. 1.15). Article 1.15 constitutes "an additional procedural safeguard required by the State of Texas but not by federal constitutional law." *Williams*, 703 S.W.2d at 678. A violation of

Article 1.15 is a "trial error" that does not implicate double-jeopardy concerns and does not entitle the defendant to acquittal. *Bender v. State*, 758 S.W.2d 278, 281 (Tex. Crim App. 1988). The appropriate remedy is to remand the cause for a new trial. *Id.*

In *Bender*, the defendant entered a plea of nolo contendere, accompanied by a form purporting to be a stipulation and judicial confession in support of the plea. *Id.* at 279-80. However, someone struck the words "I confess that [the allegations] are true" and made interlineations which prevented the stipulation from being a judicial confession. *Id*. at 280. The modifications were not noticed by the State, and the stipulations were offered as evidence and were accepted by the court as the basis for its judgment. *Id.* On appeal, Bender asserted the evidence admitted against him was insufficient to sustain his conviction. *Id.* at 279. The court of appeals agreed, reversed the conviction, and rendered a judgment of acquittal. *Id.*

The Court of Criminal Appeals reversed, stating that even if the stipulation failed to satisfy Article 1.15, acquittal was not proper. *Id.* at 280. Citing *Williams* and *Ex parte Martin*, 747 S.W.2d 789 (Tex. Crim. App. 1988), the court stated, "the failure to comply with the rather unique Texas statute [Article 1.15] does not constitute a federal constitutional violation…so that a defendant who intelligently and knowingly enters a guilty plea may stand acquitted forevermore of the crime." *Bender*, 758 S.W.2d at 280-81. If the trial court accepted such stipulated evidence

as the basis for its judgment, it was "trial error" that did not implicate federal constitutional concerns. *Id.* at 281.

The same is true here. Jackson initially accepted the plea deal offered by the State. The trial court admitted—without objection from Jackson—the State's exhibits consisting of the judicial confessions in each case. While the judicial confessions were signed by Jackson's attorney, Jackson's signature was omitted, and in place his attorney wrote "refused to sign." Apparently neither the State nor the trial court noticed this omission. After the trial court admitted the exhibits, the court accepted Jackson's guilty pleas, found Jackson guilty in each case, and assessed concurrent thirty-year sentences.

Shortly thereafter, it became apparent Jackson had not signed the judicial confessions. A few days later the trial court held the hearing to address the unsigned judicial confessions. The trial judge stated, "During the trial, you decided to go ahead and take the [thirty years], and then, I think, through an error, you didn't get to sign the judicial confession." The trial court then explained the case was in "limbo" and gave Jackson the option to either sign the judicial confessions or request a new trial. Jackson stated, "I would like to start all the way over" and requested new counsel. The court explained Jackson would first have to make a decision to accept the plea deal or move for a new trial. Jackson then answered "Yes" when asked if he wanted a new trial, and the trial court granted the oral motion.

As in *Bender*, the trial court accepted the unsigned judicial confessions as the basis for its initial judgments, but this was "trial error" that did not implicate federal constitutional concerns. *Bender*, 758 S.W.2d at 281. Accordingly, the proper remedy was to grant a new trial, which is precisely what Jackson received. Jackson was not entitled to an acquittal, and double-jeopardy principles did not bar Jackson's subsequent jury trial. *Id*.[3]

## B.  Voluntary nature of plea

Jackson contends *Bender* does not apply because he did not knowingly and voluntarily enter a plea of guilty, and thus, he essentially pleaded "not guilty." We are not persuaded.

An agreement to plead guilty entails a waiver of three significant constitutional rights: the right against self-incrimination, the right to confrontation, and the right to a trial by jury. *Ex parte Palmberg*, 491 S.W.3d 804, 807 (Tex. Crim. App. 2016) (citing *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed.2d 274 (1969)). Because such significant constitutional rights are at stake, due process requires that their relinquishment during a guilty plea be undertaken voluntarily, with sufficient awareness of the consequences. *Id.* (citing *McCarthy v. United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L. Ed.2d 418 (1969)). A

---

[3] The record includes three orders granting a new trial in each case. These orders are on the bottom of the same page as each motion for new trial. While the documents reflect a file stamp dated June 6, 2019, it is unclear when the orders were signed by the judge. The hearing on Jackson's motion for new trial occurred on June 10, 2019. Nonetheless, the Court is satisfied the record reflects the trial court's rationale for granting a new trial was a statutory defect in the judicial confessions rather than constitutionally-insufficient evidence.

defendant "must have sufficient awareness of the relevant circumstances," and must possess an understanding of the law in relation to the facts. *Id*. To determine whether a defendant's "awareness" was "sufficient" at the time of his plea, a reviewing court looks to whether the plea was a voluntary and intelligent choice among the alternative courses of action open to the defendant. *Id.*

However, a defendant need not have a comprehensive awareness of the specific impact that relinquishing his constitutional rights may have; sufficient awareness does not require complete knowledge of the prosecution's case. *Id.* "While any defendant who is deciding whether or not to plead guilty would certainly prefer to be apprised of his exact odds of an acquittal at trial, the reality is that every defendant who enters a guilty plea does so with a proverbial roll of the dice." *Id.* at 809.

Here, just before jury selection for the trial setting in June 2019, Jackson signed a plea agreement in each case for a sentence recommendation of thirty years' imprisonment in exchange for his guilty plea. In that agreement Jackson waived various constitutional and other rights and admitted to committing the offense of sexual assault of a child. The court then inquired:

> THE COURT: Are you waiving your right to a jury trial and trying to plead guilty right now?
>
> [Jackson]: I'm not guilty.
>
> THE COURT: Okay. Would you like to waive your right to a jury trial? What are you trying to do? What do you want to do, sir?

[Jackson]: I can't make—I don't know. I don't know. I don't know. I don't know. I don't know. I don't know. Your Honor, I do not know. I don't know.

THE COURT: You're fully competent, but indecisive. A doctor has seen you already. You're fine.[4] Do you want to take a plea and do this for [thirty], or do you want the jury to come in?

[Jackson]: I don't know.

THE COURT: Once I pick the jury…it is on, and we are finished with you having choices. They'll have all the choices.

[Jackson]: You decide, Your Honor.

THE COURT: It's not my life. You decide.

[Jackson]: I will go ahead and take the deal.

THE COURT: All right. So you're waiving your right to a jury trial?

[Jackson]: Yes, ma'am.

The court then asked Jackson if he understood the papers he signed. Jackson claimed he did not, so the trial court again informed Jackson the jury would decide his fate if he did not take the deal. Jackson said, "I don't want to do none of this," but his attorney explained there was not a third option: Jackson had to face a jury or take the deal. After more resistance to deciding, Jackson stated "I really don't want to lose and face life." However, once again Jackson claimed he did not understand the papers he signed. Understandably frustrated with Jackson's equivocations, the trial judge wanted to bring the jury in, but Jackson then stated, "I was going to take the [thirty] years." The court again asked Jackson if he wanted to take the plea deal,

---

[4] The record reflects Jackson underwent a competency examination by a physician, who concluded Jackson was competent to stand trial.

to which Jackson responded "Yes, ma'am." Jackson then waived the reading of the indictment, and the court accepted his guilty plea.

The record does not support Jackson's argument he did not enter the plea knowingly and voluntarily. The trial court astutely recognized Jackson simply did not want to choose between a plea or a jury trial. While Jackson did not like the binary choice before him, he understood the risk of going before the jury: "I really don't want to lose and face life." He made the intelligent decision not to take that risk and instead take the plea deal. Ultimately, Jackson's counsel explained the plea deal to Jackson and entered a guilty plea on his behalf. We conclude Jackson entered his plea knowingly and voluntarily.

Jackson cites *Nixon v. State*, 928 S.W.2d 212 (Tex. App.—Beaumont 1996, no pet.) in support of his argument. We do not find *Nixon* persuasive or helpful to our analysis, as all parties to that case acknowledged Nixon pleaded not guilty at trial. *Id.* at 213. We also note that even if Jackson's initial guilty plea were truly involuntary, the subsequent jury trial was not barred by double-jeopardy principles. *United States v. Tateo*, 377 U.S. 463, 466-68, 84 S. Ct. 1587, 1590, 12 L. Ed. 2d 448 (1964). Accordingly, *Bender* governs this case, and the defect of the unsigned judicial confession was a trial error the court corrected by giving Jackson the option to sign the judicial confession or have a new trial. Jackson chose a new trial. He was not entitled to acquittal. *Bender*, 758 S.W.2d at 281.

## C.    *Sledge* does not control

Jackson also contends acquittal was required because the trial court granted the new-trial motions based on the assertion the verdicts were "contrary to the law and the evidence." Jackson asserts that in such instances, the motions raised only a sufficiency challenge, and because the trial court granted the motions, acquittal was required. Jackson cites *Sledge v. State*, 666 S.W.3d 592, 599 (Tex. Crim. App. 2023) in support of his argument. However, *Sledge* does not control here.

In that case, a jury convicted Sledge on two drug offenses and a firearms offense. *Id* at 594-95. Sledge moved for a new trial in all three convictions, using boilerplate language requesting a new trial "for the good and sufficient reason that the verdict is contrary to the law and evidence." *Id.* The State apparently did not oppose the motion. *Id.* The record did not reflect whether a hearing was held on the motions. *Id.* The trial court granted Sledge's motions in each case, though the orders were "mere invocations" of the grounds alleged in the motion: "The above Motion is hereby granted." *Id.* At the subsequent arraignment for the new trial, Sledge's counsel argued double jeopardy barred a second trial. *Id.* at 596. However, the case proceeded, and a jury again convicted Sledge on all three previous charges. *Id.*

The case ultimately proceeded to the Court of Criminal Appeals, which analyzed whether Sledge's second trial violated double-jeopardy principles, considering the prior orders granted a new trial because "the verdict is contrary to the law and evidence." *Id.* at 598-99. The court recognized its precedent that

allegations a verdict is contrary to the law and the evidence "raise a sufficiency challenge and *only* a sufficiency challenge." *Id.* at 599 (quoting *State v. Zalman*, 400 S.W.3d 590, 594 (Tex. Crim. App. 2013) (emphasis in original)). The trial record did not reflect the basis for the grant of the new trial. Accordingly, the *Sledge* court had to assume the trial court granted the new trial based on constitutionally-insufficient evidence, a ground which normally requires acquittal when the State allows the decision to become final. *Id.* at 601-02. Based on that assumption, the court held the trial court acquitted the defendant, barring the defendant's retrial under double-jeopardy principles. *Id.* However, the Court of Criminal Appeals limited its holding:

> Importantly, this opinion does not stand for the proposition that the language "the verdict is contrary to the law and evidence" always raises a legal sufficiency challenge. Rather, we merely hold that a contrary interpretation cannot be reached beyond the confines of an absent record.

*Id.* at 602.

Here, Jackson's case does not involve a *Sledge* scenario because the record reveals the trial court's reason for granting a new trial: a statutory deficiency in the plea paperwork and subsequent judgment. As in *Sledge*, the motion for new trial included the boilerplate language "the verdict is contrary to the law and evidence," and the order simply stated the motion was "granted." However, as discussed above, the transcripts from the hearings reveal the problem stemmed from Jackson's failure (refusal) to sign the judicial confessions. Thus, the State had not offered evidence to

support the plea as required by statute. TEX. CODE CRIM. PROC. art. 1.15. The trial court recognized this statutory error and gave Jackson the option of signing the judicial confessions or moving for a new trial. Jackson chose a new trial.

The record reflects the trial court did not grant a new trial based on constitutionally-insufficient evidence. Accordingly, *Sledge* does not control this case. *Bender* controls, and Jackson is not entitled to acquittal. *Bender*, 758 S.W.2d at 281. We overrule Jackson's issues one through six.

## II. The Evidence Is Sufficient To Support Jackson's Convictions

In issues seven, eight, and nine, Jackson contends the evidence is insufficient to support his convictions for aggravated sexual assault. We disagree.

A defendant commits aggravated sexual assault of a child if he intentionally or knowingly: (1) causes the penetration of the child's sexual organ by any means; (2) causes the penetration of the child's mouth with the defendant's sexual organ; or (3) causes the child's sexual organ to contact the defendant's sexual organ. TEX. PENAL CODE § 22.021(a)(1)(B)(i)-(iii). The statute further requires the victim be younger than fourteen years of age. *Id.* § 22.021(a)(2)(B). The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault. *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd); TEX. CODE CRIM. PROC. art. 38.07(a)-(b).

Jackson was charged with aggravated sexual assault of a child by (1) penetrating D.J.'s sexual organ with his finger (cause number F18-25583); (2)

contacting D.J.'s sexual organ with his own sexual organ (cause number F18-25584); and (3) contacting and penetrating the mouth of D.J. with his sexual organ (cause number F18-25585).

## A. Trial evidence

There were no eyewitnesses to the alleged assaults and no physical evidence from the incidents. The only direct evidence surrounding the alleged assaults came from D.J.'s and Jackson's testimony. The remaining witnesses offered testimony to corroborate or refute D.J.'s and Jackson's versions of what happened. We summarize the witnesses' testimony as follows.

### 1) D.J.

D.J. testified that during 2011, Jackson sometimes lived at Bomar's Phoenix Drive house in Garland with D.J. and the other grandchildren. D.J.'s older cousin Lanishka and occasionally, Jackson, would watch the children in Bomar's absence. D.J. testified the first time Jackson assaulted her was sometime in 2011. D.J. had given massages to some family members—as she often did—but Jackson declined the offer. However, he came to D.J.'s room later that night and requested a back massage. D.J. massaged Jackson, then he asked if she would do something else. He turned over, and with his pants down, pushed D.J.'s head toward his penis. Jackson pushed D.J.'s mouth on his penis, told her to shut up, and said he would hurt her if she said anything. D.J. made muffled sounds and told him to stop. D.J. also tried hitting objects in the room to alert others in the house, but no one came. D.J. testified

Jackson also put a finger in her vagina during this incident. Jackson eventually stopped. He told D.J. if she told anyone he would kill her. D.J. believed him.

A few weeks later, D.J. was left alone at Bomar's house with Jackson while D.J.'s cousins went to the store. D.J. testified she was scared something would happen, so she locked herself in Bomar's bathroom with her journal. Jackson then opened the door lock with a wire hanger. He told D.J. he needed another favor and would pay her, but she declined. Jackson then forced his penis in D.J.'s mouth. D.J. tried to bite down to prevent it, but Jackson grabbed her head and forced her to perform oral sex upon him. Jackson ejaculated and "white stuff" got on D.J.'s journal.[5] D.J. testified Jackson then picked D.J. up, pulled down her pants, and put his penis in her anus. It was very painful; she was crying and screaming.

D.J. testified there were approximately ten additional incidents, most involving forced oral sex. However, on one occasion during which D.J. was performing oral sex, Jackson tried to put his penis in D.J.'s vagina, but she told him it hurt. D.J. said all the incidents happened at Bomar's house. The more D.J. would fight, the more aggressive Jackson would become, so D.J. became compliant.

D.J. testified that, sometime later at vacation bible school, she told her brother, D.J.2, that Jackson had touched her inappropriately, but D.J.2 did not believe it. D.J. also said she told some school friends about the incident. Years later, in 2018,

---

[5] This journal was either destroyed in a 2017 house fire or thrown away by D.J., according to differing testimony.

Jackson moved back into Bomar's house, and D.J. did not feel comfortable with him there. Jackson would come into the room when D.J. was showering, changing, or sleeping. On one of these occasions, D.J. yelled at Jackson and B.J. saw him in the doorway. Sometime thereafter, D.J. texted B.J. and told her Jackson had touched D.J. when she was younger. D.J. later told Bomar that Jackson had raped her when she was ten years old. D.J. reported Jackson to police.

### 2) D.J.2

The State called D.J.2 (D.J.'s brother) in support of D.J.'s case. He generally corroborated D.J.'s testimony that, during Grandfather's cancer battle, D.J. and D.J.2 were sometimes at the house without Bomar or Grandfather, and during these times cousin Lanishka was in charge. D.J.2 testified D.J. was really emotional during a balloon-release ceremony at vacation bible school but did not recall D.J. sharing anything specific with him. However, in retrospect, D.J.2 said it was not hard to put things together.

### 3) B.J.

D.J.'s older sister B.J. testified for the State. B.J. agreed that when Bomar and Grandfather were at the hospital, Lanishka often watched the children. However, Lanishka was not always there, and Jackson was sometimes present. B.J. and Jackson did not really get along; Jackson had a violent attitude and would sometimes get physical.

B.J. testified that in 2018, when Jackson had moved back into the house, D.J. was upset. During a trip to the store, D.J. texted B.J. and said Jackson had touched D.J. when she was younger. Upon return to the house, D.J. told B.J. her details of the incidents. B.J. insisted D.J. tell Bomar. Later that evening, B.J. overheard Bomar and Jackson in the garage talking about D.J.'s allegations. B.J. said when Bomar confronted Jackson, he initially denied it, but when Bomar specifically asked about D.J., Jackson put his head down and did not deny it. He said he knew it was coming, would have to face it, and he had apologized to D.J. every day for what he did.

### 4) Brenda Bomar

Brenda Bomar testified she spent significant time at the hospitals when her husband (Grandfather) was battling cancer in 2011. However, she would travel back and forth to the Phoenix Drive house during these times. Bomar noticed a behavior change in D.J. during this time. D.J. had complained about her bowels or "behind" bothering her. Bomar thought it was constipation.

In 2018, Jackson came back to live at Bomar's house. D.J., D.J.2, and B.J. were still living there too. On the night the allegations surfaced, Bomar saw the grandchildren talking outside. When Bomar approached, she saw B.J. and D.J. upset and crying. Bomar inquired as to the problem, and D.J. said Jackson had raped her when she was ten years old. Bomar and Jackson later talked in the garage. Bomar asked Jackson if he had ever done anything to the grandchildren to make them hostile. Jackson said no, but when Bomar specifically asked if he had ever done

–22–

anything to D.J., Jackson dropped his head to the floor. Bomar had to bend over to make eye contact. Bomar testified that, in the past whenever they would catch Jackson doing anything wrong, the first thing he would do is drop his head. So, when he dropped his head and would not look at her, she knew.

Jackson said he did not feel comfortable talking about it and that "y'all just don't know what happened to me and what people did to me." Bomar told him he needed help. Jackson told her he had apologized to D.J. every day and tried to make it right. Bomar said Jackson never denied it until the next morning. Bomar told him he could not stay there; Jackson said "I know what's coming to me. I been waiting on this." Bomar drove him to the train station the next morning and gave him twenty dollars.

### 5) Lanishka Edmond

Lanishka Edmond, Jackson's older sister, testified for the defense. She stated Jackson was accused of something he did not do. She said she was the acting adult at Bomar's house whenever Bomar and Grandfather were gone. Lanishka never saw or heard of anything inappropriate or sexual. She said D.J. and D.J.2 were troublemakers.

She testified she overheard the conversation between Bomar and Jackson in the garage on the night the accusations surfaced. Lanishka said Jackson hung his head to indicate disbelief Bomar would ask something like that. Lanishka said

Jackson told Bomar he did not do anything to D.J., D.J.2, or B.J. Lanishka claimed no one else was present during this conversation.

Lanishka further opined Bomar is a liar and the reason Jackson was prosecuted. Lanishka believed Bomar was trying to make amends for other people allegedly molested in the family. Lanishka believed D.J. fabricated the incidents.

### 6) Jacquala Ervin

Jackson's cousin Jacquala Ervin also testified for the defense. She said whenever she asked Jackson about the allegations, he denied them and never wavered. D.J. told Jacquala that Jackson took D.J. to the bedroom, laid her down, put his hand over her mouth and told her not to say anything. D.J. did not say Jackson penetrated her in any manner or forced oral sex. Jacquala suggested people would have heard noises coming from people in bedroom, which had no doors. Jacquala said D.J. lies, but she and D.J. became closer as D.J. got older.

### 7) Zaniqua Davis

Jackson's aunt Zaniqua Davis testified for the defense. She stated Grandfather was admitted to the hospital in January 2011 and Bomar would not leave his side. She further stated Jackson was not with the children when they were at the Fisher House.[6] B.J., D.J.2, and D.J. came to live with Zaniqua in August 2011, and lived there until the end of the semester. The children were not at Bomar's house

---

[6]    The Fisher House is housing for families whose loved ones are in the Veteran's Administration (V.A.) hospital. Bomar lived at the Fisher House for a period in 2011 after Grandfather was transferred to a V.A. hospital.

during this time. Bomar and the children returned to Bomar's house in November or December 2011.

Zaniqua also testified the family dynamic changed after Grandfather died in 2012. Zaniqua said the children started acting up, did not want people in the house, and were manipulating things. She said Jackson told her the children were picking on him, making accusations, and Bomar was not listening. Zaniqua once thought Bomar was a truthful person, but no longer. Zaniqua did not believe Bomar's statements that Jackson admitted the accusations.

### 8) Lamisa Edmond

Jackson also called his aunt Lamisa Edmond to testify. Lamisa testified Jackson always denied the accusations. Lamisa also testified that in 2016 or 2017, D.J. alleged one of D.J.'s mom's friends had touched her while D.J. lived in a Balch Springs house with her mother and others.

### 9) Other trial witnesses

The parties called several other witnesses who gave brief testimony. State's witness Captain Anthony Stokes of the Garland Police Department testified he investigated D.J.'s complaint. He said D.J. claimed the incidents occurred sometime after her tenth birthday, around Christmas 2011. He did not find anything to discredit what D.J. alleged. He believed D.J. was truthful. Stokes indicated other people gave corroborating testimony. Text messages between D.J. and B.J. corroborated their stories. And, nothing about Bomar's statements seemed suspicious or incredible.

–25–

Stokes believed there was no dispute Jackson was present at Bomar's house during the alleged incidents.

Bibiana Gutierrez, a forensic interviewer with DCAC, testified for the State. She testified the person who originally interviewed D.J. had moved to Baltimore. However, Gutierrez watched the interview and believed procedures were correctly followed; there were no red flags. D.J. disclosed abuse during the interview.

The State also offered testimony from Margaret Evans, a therapist and assistant director with DCAC. She generally testified child sexual abuse victims do not testify in any particular manner. Some are avoidant, some emotional, and others are more matter-of-fact.

### 10) Rondal Jackson

Jackson testified as the defense's final witness. He initially testified he never stayed at Bomar's house in 2011, but later admitted he lived there sometimes for "weeks" during that time. He stated B.J., D.J. and D.J.2 did not live at Bomar's house around the time Grandfather was sick. He denied taking D.J. into the boys' bedroom and forcing her mouth onto his penis. He further testified he did not know how to pick locks and did not enter the bathroom when D.J. was inside. He denied putting his penis in D.J.'s mouth or anus. He also denied putting his penis or fingers in D.J.'s vagina. Jackson said he never touched anyone inappropriately.

Regarding the garage conversation with Bomar, Jackson testified he had "gotten into it" with B.J. days before, and the children were trying to get Jackson out

of the house. Jackson stated Bomar's testimony about the garage conversation was incorrect; he did not drop his head like he was guilty or ashamed, he shook his head. He did not admit to anything, and when Bomar asked if he had done anything to D.J, he said no. Jackson testified Bomar twists people's words and previously painted Jackson as the bad guy when he was at the house. He said he never told Bomar he apologized to D.J.

Jackson also stated in 2018 he would sometimes drive the children around at Bomar's request. D.J. was not scared and would ride in the front seat. There was never any tension until he got into an altercation with B.J. He claimed B.J. had put D.J. up to the whole thing.

## B.    Sufficiency analysis

D.J.'s testimony itself established the necessary elements of each charge for aggravated sexual assault of a child. D.J. testified that, over several occasions in 2011, Jackson penetrated her vagina with his finger, caused his penis to contact her vagina, and penetrated D.J.'s mouth with his penis. The trial record reflects each of these acts occurred when D.J. was younger than fourteen years of age. Again, the testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault. *Tear*, 74 S.W.3d at 560; TEX. CODE CRIM. PROC. art. 38.07(a)-(b). Accordingly, the State presented sufficient evidence to support each conviction for aggravated sexual assault of a child. *See* TEX. PENAL CODE § 22.021(a)(1)(B)(i)-(iii), (a)(2)(B). While Jackson certainly denied the allegations, the jury acts as the sole

judge of the credibility of the witnesses and may choose to believe all, some, or none of the testimony presented. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

The State's remaining key witnesses—Captain Stokes, D.J.2, B.J., and Bomar—offered testimony tending to corroborate D.J.'s allegations. Conversely, Jackson's key witnesses—Lanishka Edmond, Jacquala Ervin, Zaniqua Davis, and Lamisa Edmond—offered testimony attempting to refute D.J.'s allegations and to call into question the credibility of the State's witnesses. However, the jury was free to believe or disbelieve some or all of the testimony, and it was up to the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Laster v. State*, 275 S.W.3d 512, 522 (Tex. Crim. App. 2009). When faced with conflicts in the evidence, we presume the fact-finder resolved those conflicts in favor of the verdict and defer to that determination. *Edward v. State*, 635 S.W.3d 649, 656 (Tex. Crim. App. 2021). We do not sit as the thirteenth juror and may not substitute our judgment for that of the fact-finder by reevaluating the weight and credibility of the evidence. *Garcia*, 667 S.W.3d at 762.

Jackson argues the assaults could not have occurred because either he or D.J. was not at Bomar's house at the time of the alleged assaults. Jackson asserts Bomar testified she never left Grandfather's side when he was in the hospital, but D.J. testified Bomar was home during the first alleged assault. Thus, according to

Jackson, the incident could not have happened when D.J. claimed. However, Bomar testified she was driving back to her house as necessary, rather than literally living in her husband's hospital room. Bomar also testified there were times at Bomar's house when Jackson was there and Lanishka was in charge. Furthermore, while Jackson initially said he never stayed at Bomar's house in 2011, he later admitted he would stay there, sometimes for "weeks." Ultimately, the jury could have concluded Jackson had opportunities to commit the assaults as alleged.

Jackson also contends the assault could not have occurred because of the timeline. Jackson asserts D.J. testified she thought the first incident occurred during the summer of 2011, but the grandchildren were living at the Fisher House during this time. Thus, according to Jackson, the alleged assaults at Bomar's Phoenix Drive house did not occur. However, D.J. also told Officer Stokes she thought the assaults occurred during winter break, around Christmas 2011. During this time, D.J. and her siblings had returned to living at Bomar's house. Any discrepancies in D.J.'s testimony regarding the timing of the assaults were for the jury to resolve.

We further note the State was not required to prove the exact date of the charged offenses. When an indictment alleges that an offense occurred "on or about" a certain date, the State is not required to prove the offense occurred on the specific date alleged, but only that the offense occurred prior to the presentment of the indictment and within the limitations period. *Sledge v. State*, 953 S.W.2d 253, 255–56 (Tex. Crim. App. 1997); *see* TEX. CODE CRIM. PROC. art. 21.02(6). Here, the 2019

indictments alleged the offenses occurred on or about December 1st, 2nd, and 12th of 2011, respectively. While the exact dates of the assaults may not be clear, the State was not required to prove such, and the trial evidence supports the assaults occurred prior to the presentment of indictment.

We conclude, viewing the evidence in the light most favorable to the verdict, a rational fact-finder could have found the essential elements of aggravated sexual assault of a child beyond a reasonable doubt. *See Whatley*, 445 S.W.3d at 166. Accordingly, we conclude there is sufficient evidence to support each of Jackson's convictions. We overrule Jackson's issues seven, eight, and nine.

## III. Duplicative Costs

In issues ten and eleven, Jackson contends the trial court erred in assessing duplicative costs in cause numbers F18-25584 and F18-25585. We agree.

"In a single criminal action in which a defendant is convicted of two or more offenses or of multiple counts of the same offense, the court may assess each court cost or fee only once against the defendant." TEX. CODE CRIM. PROC. art. 102.073(a). For purposes of this rule, a person convicted of two or more offenses in the same trial is convicted of those offenses in a "single criminal action." *Shuler v. State*, 650 S.W.3d 683, 690 (Tex. App.—Dallas 2022, no pet.). Generally, the cost should be assessed in the case with the highest category offense but, when the convictions are for the same category of offense and the costs are the same, the costs

–30–

should be assessed in the case with the lowest trial court cause number. *Id.*; *see also* TEX. CODE CRIM. PROC. art. 102.073(b).

Here, Jackson was tried in a single action for three counts for the same offense. Each conviction was for the same category of offense: aggravated sexual assault of a child. *See* TEX. PENAL CODE § 22.021(a)(1)(B)(i)-(iii), (a)(2)(B). However, each judgment reflects an assessment of $599.00 in court costs. The costs assessed in the bill of costs in each cause number are identical. The trial court could assess court costs and fees against Jackson only once. TEX. CODE CRIM. PROC. art. 102.073(a). The State agrees. Accordingly, costs should only be assessed in the lowest cause number: F18-25583. *Shuler*, 650 S.W.3d at 690. We modify the judgments in cause numbers F18-25584 and F18-25585 to remove the $599.00 in court costs. We sustain Jackson's issues ten and eleven.

## IV. State's Cross-issues

In three cross-issues, the State asserts we should modify the judgment to reflect: (1) Jackson must register as a sex offender, (2) the victim was ten years old, and (3) an affirmative finding the victim was younger than fourteen years old. We agree.

This Court may modify the trial court's judgment to make the record speak the truth when it has the necessary data and information to do so. TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W. 2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

Aggravated sexual assault of a child under fourteen years of age is an offense subject to the sex-offender registration requirements of Chapter 62. TEX. CODE CRIM. PROC. arts. 62.001(5)(A), 62.051(a). When sex-offender registration is required, the judgment must contain (1) a statement that the registration requirement of Chapter 62 of the Code of Criminal Procedure applies to the defendant, and (2) a statement of the age of the victim. *Id.* art. 42.01, § 1(27).

Jackson was convicted of aggravated sexual assault of a child under fourteen years of age, and the record supports D.J. was ten years old at the time of the assaults. However, each judgment erroneously states the sex-offender registration requirements do not apply and the age of the victim at the time of the offense is "N/A." Therefore, we modify the judgments in cause numbers F18-25583-K, F18-25584-K, and F18-25585-K to reflect (1) the Chapter 62 sex-offender registration requirements apply to Jackson, and (2) the victim's age was ten years at the time of the offense. *See id.* arts. 42.01 § 1(27), 62.051; *Backusy v. State*, No. 05-17-01288-CR, 2018 WL 5730166, at *3–4 (Tex. App.—Dallas Nov. 2, 2018, pet. ref'd) (mem. op., not designated for publication) (modifying trial court judgment to include sex-offender registration requirement and victim's age).

Furthermore, the Code of Criminal Procedure requires an affirmative finding the victim of a sexually violent offense was younger than fourteen years of age. TEX. CODE CRIM. PROC. art. 42.015(b). A "sexually violent offense" includes aggravated sexual assault "committed by a person 17 years of age or older." *Id.* art. 62.001(6).

The record reflects Jackson was nineteen or twenty years old at the time of the assaults, and D.J. was ten years old. Accordingly, we modify each judgment in cause numbers F18-25583-K, F18-25584-K, and F18-25585-K to reflect an affirmative finding the victim was younger than fourteen years of age at the time of the offense. *See id.* art. 42.015(b); *Backusy*, 2018 WL 5730166, at *4. We sustain the State's first, second, and third cross-issues.

## CONCLUSION

The trial court did not err by refusing to acquit Jackson after granting his motions for new trial. The trial court granted Jackson's motion for new trial based on statutory deficiencies in Jackson's guilty plea rather than constitutionally-insufficient evidence. Accordingly, double-jeopardy principles did not bar Jackson's subsequent jury trial. Furthermore, the evidence is sufficient to support Jackson's convictions for aggravated sexual assault of a child in each cause number.

The trial court erred in assessing duplicative costs in cause numbers F18-25584-K and F18-25585-K. Those duplicative costs must be deleted. Finally, the trial court's judgment must be modified to reflect Jackson must register as a sex offender, his victim was ten years old, and an affirmative finding the victim was under fourteen years of age.

Accordingly, we modify each judgment in cause numbers F18-25584-K and F18-25585-K to delete the duplicative court costs of $599.00. We also modify the judgments in cause numbers F18-25583-K, F18-25584-K, and F18-25585-K to

–33–

reflect: (1) Jackson must register as a sex offender in accordance with Chapter 62 of the Code of Criminal Procedure; (2) the victim was ten years old; and (3) an affirmative finding the victim was younger than fourteen years old at the time of the offense. As modified, we affirm the trial court's judgments.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
221177F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

RONDAL KEITH JACKSON,
Appellant

No. 05-22-01177-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 4, Dallas County, Texas
Trial Court Cause No. F18-25584-K.
Opinion delivered by Justice Partida-
Kipness. Justices Nowell and Smith
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**MODIFIED** as follows:

Delete the court costs of $599.00.

Checkmark the box to indicate "Defendant is required to register as sex
offender in accordance with Chapter 62, CCP."

Modify the statement "The age of the victim at the time of the offense was
N/A" to "The age of the victim at the time of the offense was ten (10)
years."

In the box titled "Offense for which Defendant Convicted," modify to state:
"Aggravated Sexual Assault of a Child: Victim Under Fourteen."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 17th day of April, 2024.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

RONDAL KEITH JACKSON,
Appellant

No. 05-22-01178-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 4, Dallas County, Texas
Trial Court Cause No. F18-25583-K.
Opinion delivered by Justice Partida-
Kipness. Justices Nowell and Smith
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**MODIFIED** as follows:

Checkmark the box to indicate "Defendant is required to register as sex
offender in accordance with Chapter 62, CCP."

Modify the statement "The age of the victim at the time of the offense was
N/A" to "The age of the victim at the time of the offense was ten (10)
years."

In the box titled "Offense for which Defendant Convicted," modify to state:
"Aggravated Sexual Assault of a Child: Victim Under Fourteen."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 17th day of April, 2024.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RONDAL KEITH JACKSON,
Appellant

No. 05-22-01179-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4, Dallas County, Texas Trial Court Cause No. F18-25585-K. Opinion delivered by Justice Partida-Kipness. Justices Nowell and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Delete the court costs of $599.00.

Checkmark the box to indicate "Defendant is required to register as sex offender in accordance with Chapter 62, CCP."

Modify the statement "The age of the victim at the time of the offense was N/A" to "The age of the victim at the time of the offense was ten (10) years."

In the box titled "Offense for which Defendant Convicted," modify to state: "Aggravated Sexual Assault of a Child: Victim Under Fourteen."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 17th day of April, 2024.